IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. C 02-4948 JSW |
| v. | |
| REAL PROPERTY AT 6557 ASCOT DRIVE, OAKLAND, CALIFORNIA, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant, | |
| STEVEN FONTAINE and NILOUFER FONTAINE, | |
| Claimants. | |

Now before the Court is the motion for summary judgment filed by plaintiff United States of America. Having considered the parties' papers, relevant legal authority, the record in this case, and having had the benefit of oral argument, the Court hereby grants the United States' motion for summary judgment.[1]

**BACKGROUND**

This is a forfeiture action regarding Defendant Property 6557 Ascot Drive ("Defendant Property"). The United States contends that claimant Steven Fontaine ("Fontaine") purchased Defendant Property with proceeds from wire fraud and/or money laundering.

---

[1] The Court need not rule on the United States' evidentiary objections because the Court did not need to consider such evidence in order to resolve the motion for summary judgment.

1    Fontaine is the managing director of Regalia Fund Limited ("Regalia Fund").
2    (Declaration of Claimant Fontaine ("Fontaine Decl."), ¶ 1, Ex. 3.) The Regalia Fund's Offering
3    Memorandum promised the following: (1) to guarantee the principal invested and guarantee an
4    8 percent dividend on the invested principal to be paid quarterly; (2) to deliver guarantees from
5    a AA-rated bank; and (3) to provide a variable dividend, which when added to the fixed
6    dividend will equal 78 percent of the net profit of the Fund. (*Id.*, Ex. 3.)

   On June 10, 2002, Fontaine received three wire transfers from three investors' accounts
at the Royal Bank of Scotland into a Regalia Fund account at Gruntal, account #72R-126706.
Fontaine received $12,551,491.50 from Hereford Humanitarian Business Trust ("HHBT"),
$7,713,898.75 from Huibert Johannes Van Praag ("Van Praag"), and $3,630,070 from
Longmead Properties Limited ("Longmead"). (Declaration of Agent Joseph Camillucci
("Camillucci Decl."), Exs. 2, 3.) On June 27, 2002, Fontaine withdrew $1,015,557 from the
account. Fontaine testified that this sum was a fee that Regalia charged. (Deposition of Steven
Fontaine ("Fontaine Depo.") at 132:7-17, Ex. 43.)

   One of the trustees of HHBT introduced Edgard Hall, General Partner of Trade
Securities International Limited ("TSI"), to other HHBT trustees because Hall claimed expertise
in identifying fund managers and in making arrangements for the trust to preserve capital and
potentially to obtain above-market returns. (Deposition of Robin J. Derry ("Derry Depo.") at
16:15-17:3.) HHBT and TSI established a limited partnership, Trade Sureties Hereford Limited
Partnership. (*Id.*, 14:14-15:24, Exs. 4, 5.) In the spring of 2002, Hall presented an opportunity
to HHBT to invest funds with Regalia Fund. (*Id.*, 37:12-20.) Hall told HHBT that the Regalia
Fund required the investment to be in cash. (*Id.*, 37:15-23.) Hall provided the initial screening
of Regalia Fund for HHBT and then HHBT obtained the Regalia Fund's Offering
Memorandum. (*Id.*, 38:13-23, ex. 13.) The sole condition which permitted HHBT to invest in
the Regalia Fund was that it would provide a guarantee of the capital from an AA-rated bank.
The Regalia Fund's promise to pay a quarterly dividend of two percent was also an important
factor in HHBT's decision to invest with the Regalia Fund. (*Id.*, 45:8-46:16.)

2

1  In a letter dated June 26, 2002 on Regalia Fund letterhead, Fontaine stated that he
2  expected that the guarantee to HHBT should be delivered by July 12, 2002. (*Id*., Ex.20.)  In a
3  letter dated July 19, 2002, Fontaine stated that he expected the guarantees to be issued by the
4  end of the next week. (*Id*., Ex. 24.)  Fontaine confirmed that the shares were issued on July 1,
5  2002. (*Id*., Ex. 25.)  However, Fontaine never provided the guarantees or issued the shares.

6  Van Praag was looking to invest between $7 and $9 million and was introduced to Hall.
7  (Declaration of Huibert Va n Praag ("Van Praag Depo.") at 13:14-14:3.)  Van Praag joined with
8  another investor, Longmead, who was identified by Hall, to form a limited partnership with
9  TSI, Trade Sureties Ameland Limited Partnership. (*Id*., 16:16-17:7.)  Hall identified the
10 Regalia Fund as an investment opportunity. (*Id*., 18:7-11.)  Hall gave Van Praag a copy of
11 Regalia Fund's offering memorandum. (*Id*., 25:12-24.)  Van Praag decided to invest in the
12 Regalia Fund because of the promised guarantees of the capital by an AA-bank and the
13 promised eight percent annual return, payable two percent per quarter. (*Id*., 20:11-25.)
14 Fontaine confirmed that the AA-bank guarantees would be issued as soon as possible and that
15 the shares were issued on July 1, 2002. (*Id*., Ex. 78.)  However, Fontaine never provided the
16 guarantees or issued the shares. (Fontaine Depo. at 267:6-22.)

17 On July 26, 2002, Fontaine transferred by wire the balance of the Regalia Fund account
18 at Gruntal, $22,909,503.85, to a Regalia Fund account at Morgan Stanley Dean Witter, account
19 #119 012034, in Berkeley, California. (Camillucci Decl., Exs. 2,3.)  On August 1, 2002,
20 Fontaine transferred by wire the balance of the account at Morgan Stanley Dean Witter,
21 $22,909,503.85, to a Regalia Fund account at Bank of America, account #01755-03172, in
22 Berkeley, California. (*Id*.)

23 Fontaine then used the investors' money for numerous personal expenses, including
24 purchasing Defendant Property, giving $125,000 to his wife and her family, paying $120,000 in
25 Cartier jewelry, and paying $106,000 for four vehicles for himself and his family. (Fontaine
26 Depo. at 143:19-149:24, 152:21-153:9, 154:11-155:1 156:15-162:2, 270:13-293:6, Exs. 49, 50,
27 53, 54, 94.)  On August 5, 2002, Fontaine transferred $1,556,997.30 by wire from the Regalia
28 Fund account at Bank of American to the escrow account #54604-52250490-EBC at North

3

American Title Company which he used to purchase Defendant Property. (Camillucci Decl., Exs. 2,3.)

When asked whether it was proper to commingle the investors' money with his own money, Fontaine responded: "I was the sole, single shareholder in Regalia Fund. So Regalia Fund, Stephen Fontaine, Steven Fontaine is Regalia Fund. I'm entitled to use Regalia Fund as if doing business as Steven Fontaine." (Fontaine Depo. at 293:21-294:3.)

The Court will address additional specific facts as required in the analysis.

## ANALYSIS

### A.     Legal Standard on Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to

4

"scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

**B.     The United States' Motion for Summary Judgment.**

The United States contends that it is entitled to summary judgment on the grounds that defendant 6557 Ascot Drive (the "Defendant Property") is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it was purchased with the proceeds of wire fraud in violation of 18 U.S.C. § 1343. The United States also contends that the Defendant Property is subject to forfeiture pursuant to § 981(a)(1)(A) because the Defendant Property is property that is involved in illegal money laundering transactions involving criminally derived property (the proceeds of wire fraud) in violation of 18 U.S.C. § 1957.

In a civil forfeiture proceeding, the government must prove, by a preponderance of the evidence, that the property is subject to forfeiture. *See* 18 U.S.C. § 983(c); *see also United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir. 2008). Any property "which constitutes or is derived from proceeds traceable to a violation of ... any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)" is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C). In cases involving unlawful activities, proceeds are defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." *See* 18 U.S.C. § 981(a)(2)(A).

5

Wire fraud is a "specified unlawful activity." *See* 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961. To demonstrate wire fraud, the United States must show: (1) a scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises; (2) use of the wires in furtherance of the scheme; and (3) the specific intent to defraud. *Carpenter v. United States*, 484 U.S. 19, 27 (1987); *United States v. McNeil,* 320 F.3d 1034, 1040 (9th Cir. 2003). Intent to defraud may be demonstrated through circumstantial evidence. *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003).

The United States argues that Fontaine devised a scheme, using the Regalia Fund, to defrauding investors to obtain $24 million from them by making false representations that their investments and an 8% annual dividend would be protected by guarantees from a AA rated back which would be delivered to the investors. Fontaine made these representations with an intent to defraud and to influence the investors in the Regalia Fund when Fontaine knew that he had no ability to obtain the guarantees and did not obtain them. Fontaine used wire transfers to transfer the investors' funds to a Regalia Fund account at the Bank of America from which he used the investors money as his own and purchased Defendant Property. Upon review of the record in this matter, the Court finds that the United States submits evidence to demonstrate these facts.

Fontaine argues that he did not have any intent to defraud and that he intended to provide the promised guarantees but was precluded from doing so. However, Fontaine fails to submit admissible evidence to demonstrate such alleged facts. Fontaine argues that the investors' funds were frozen when they were held in the Regal Fund account at Gruntal between June 10 and July 26, 2002. In support of this statement, Fontaine cites to Exhibit 4 to his declaration, which is a fax dated *June 21, 2002*, stating that the initial problem of unidentified funds had been cleared and that the clients had been identified. (Fontaine Decl., Ex. 4.) Notably, on *June 27, 2002*, Fontaine withdrew $1,015,557 from the account at Gruntal and sent

6

it to the law firm of McFaden. (Fontaine Depo. at 132:7-17, Ex. 43.) The fact that money was withdrawn on June 27, 2002 demonstrates that the funds were not frozen until July 26, 2002.[2]

Even if the funds had been frozen when they were in an account Gruntal, Fontaine has not submitted evidence demonstrating that he was precluded from obtaining the promised guarantees and issuing the promised shares after July 26, 2002. Fontaine argues that after the funds were no longer frozen, a dispute between Hall and the investors (HHBT, Van Praag, and Longmead) as to who were the true beneficial owners of the investment with the Regalia Fund precluded him from obtaining the promised guarantees. However, the evidence submitted by Fontaine indicates that on August 13, 2002, HHBT wrote a letter to terminate the partnership between it and TSI. (Fontaine Decl., Ex. 5.) Even if it were true that a dispute regarding ownership precluded him from obtaining guarantees, Fontaine has not submitted any evidence to show that he was aware of the alleged ownership dispute before August 13, 2002.[3] Thus the Court finds that Fontaine has not shown that he was precluded from obtaining the promised guarantees between July 26 and August 13, 2002. Therefore, Fontaine has not demonstrated a question of fact regarding his intent to defraud.

Fontaine also argues that he was entitled to use the investors' money in the Regalia Fund account because the Regalia Fund's Board of Directors authorized the Regalia Fund to loan the money to Fontaine. (Fontaine Decl., Ex. 10.) However, even if the loan documents were authentic, Fontaine has not demonstrated that he or the Regalia Fund had the authority to

---

[2] Fontaine also testified in his deposition that the funds were frozen while they were in the account at Gruntal. (Fontaine Depo. at 267:13-22.) However, where, as here, the factual context makes the nonmoving party's claim of the existence of a material fact implausible, that party must "present more persuasive evidence that would otherwise be necessary in order to defeat a summary judgment motion." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (internal quotes and citation omitted). The letter submitted by Fontaine stating that the problem regarding the funds had been cleared by June 21, 2002 and Fontaine's withdrawal of $1,015,557 on June 27, 2002, renders Fontaine's claim that the funds were frozen from June 10 to July 26, 2002 implausible. Therefore, Fontaine needed to submit more persuasive evidence to create a question of fact regarding his ability and intent to provide the promised guarantees. Regardless, as discussed below, even if Fontaine had demonstrated the funds were frozen until June 26, 2002, Fontaine fails to demonstrate that he was precluded from providing the promised guarantees after this point.

[3] Notably, Fontaine withdrew the funds to purchase the Defendant Property on August 5, 2002, before he even argues that the alleged dispute over ownership arose.

7

loan the investors' money to him. Before Fontaine started withdrawing money from the Regalia Fund account for his personal use, Fontaine had already been paid all of the management fees possibly owed to the Regalia Fund. The Regalia Fund's Offering Memorandum provides for an initial management of 3 percent and an annual fee of 1.25 percent. (Fontaine Decl., Ex. 3.) Based on the investment of $23,895,460 by HHBT, Van Praag, and Longmead, the initial 3 percent fee and the annual 1.25 percent fee amounted to approximately $1,015, 557. On June 27, 2002, Fontaine withdrew $1,015,557 from the Regalia Fund account at Gruntal. Fontaine testified that this sum was a fee that Regalia charged. (Deposition of Steven Fontaine at 132:7-17, Ex. 43.)

Although the Offering Memorandum provides that Directors of the Regalia Fund will be paid "at such rate as may from time to time be determined by a resolution to be adopted during a general meeting," (Fontaine Decl., Ex. 3), Fontaine has not submitted any evidence demonstrating that the Regalia Fund adopted a resolution to pay the Directors more than the fee specified in the Offering Memorandum. The loan documents, even if authentic, provide that the Regalia Fund may loan Fontaine money, not that the Regalia Fund shall provide Fontaine additional renumeration. Accordingly, the Court finds that the United States has demonstrated that the Defendant Property was purchased with the proceeds of wire fraud and that, therefore, the Defendant Property is subject to foreclosure.[4] The Court thus grants the United States' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the United States' motion for summary judgment.

---

[4] Because the Court finds that the Defendant Property was purchased with the proceeds of wire fraud, the Court need not determine whether the United States has also demonstrated that the Defendant Property was purchased with proceeds of money laundering.

**IT IS SO ORDERED.**

Dated: March 30, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE